JUDGE LYNCH

07 CV 10493

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: SHARON COHEN LEVIN(SCL-4124)
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1060

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA

        Plaintiff,       :

                               VERIFIED COMPLAINT

    - v -             :

                               07 Civ.

$136,000,000.000 IN UNITED STATES  :
CURRENCY

        Defendant-*in-rem*.

------------------------------------x

        Plaintiff United States of America, by its attorney Michael J. Garcia, United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

### I. JURISDICTION AND VENUE

        1.   This action is brought pursuant to 18 U.S.C. § 981 by the United States of America seeking the forfeiture of the following sums of money:

    APPROXIMATELY $136,000,000 IN UNITED STATES CURRENCY (collectively, the "Defendant Funds" or the "defendant-in-rem").

        2.   This Court has jurisdiction pursuant to 28 U.S.C. § 1355.

3.  Venue is proper under 28 U.S.C. § 1355(b)(1)(A) because certain actions and omissions giving rise to forfeiture took place in the Southern District of New York and pursuant to 28 U.S.C. § 1395 because defendants-in-rem funds will be transferred to the Southern District of New York.

4.  The Defendant Funds constitute property constituting and derived from proceeds of wire fraud, conducting an illegal gambling business, and operating an unlicensed money transmitting business, in violations of Title 18, United States Code, Sections 1084, 1955, 1956(a)(2), and 1960, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(a).

## II.  PROBABLE CAUSE FOR FORFEITURE

### Overview of the Fraud

5.  In 1999, NETeller Inc. was founded by Stephen Eric Lawrence, John David Lefebvre, and others to provide Internet money transfer services to customers located in, among other places, the United States, and to merchants, including Internet gambling operators, located outside of the United States.  In May 2000, NETeller Inc. was incorporated in Alberta, Canada.  On December 31, 2003, NETeller Ltd., a company incorporated in the Isle of Man, and its subsidiary, NT Services Ltd. ("NT Services"), a company incorporated in Alberta, Canada, purchased the business,

including the assets, such as the intellectual property, from NETeller Inc.

5. On April 1, 2004, NETeller Ltd. re-registered as a public limited company with the name NETeller plc ("NETeller"). NETeller is and was the parent to various subsidiaries, including NETeller (UK) Ltd., NT Services, and Cardload Inc. ("Cardload"), which are collectively known as the NETeller Group. On April 8, 2004, NETeller offered its shares to the public. On April 14, 2004, NETeller was admitted to trade on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE"). At its peak in September 2005, the market capitalization of NETeller was approximately $2 billion.

6. In July 2000, NETeller Inc. began transferring funds using bank wires and other means between customers located in the United States and Internet merchants, primarily Internet gambling operators, located outside of the United States. The dominant users of NETeller Inc.'s money transfer services were United States customers, including customers in the Southern District of New York, who used NETeller Inc.'s systems to fund customer accounts with Internet gambling businesses located outside of the United States. These Internet gambling businesses provided to United States customers through the Internet real-money gambling services, such as sports betting, casino, and poker games, in violation of various state and federal laws in the United States.

7. In 2000, NETeller Inc. processed approximately $13.3 million in transactions for customers located in the United States, and NETeller Inc.'s gross revenue generated from those transactions was approximately $289,000. In 2001, NETeller Inc. processed approximately $117.6 million in transactions for customers located in the United States, and NETeller Inc.'s gross revenue generated from those transactions was approximately $2.1 million. In 2002, NETeller Inc. processed approximately $326 million in transactions for customers located in the United States, and NETeller Inc.'s gross revenue generated from those transactions was approximately $7.1 million. In 2003, NETeller Inc. processed approximately $1.167 billion in transactions for customers located in the United States, and NETeller Inc.'s gross revenue generated from those transactions was approximately $30.7 million.

8. By December 2003, NETeller Inc. offered its money transfer services to over 1,000 merchants and over 600,000 customers. At that time, the majority of NETeller Inc.'s individual customers were located in the United States, including in the Southern District of New York, and the majority of NETeller Inc.'s merchant customers were Internet gambling operators located outside of the United States.

9. At the time of NETeller's initial public offering ("IPO") in April 2004, the NETeller Group had approximately

680,000 customer accounts, of which approximately 88% belonged to North American residents, the majority of which were residents of the United States. At the time of its IPO, NETeller estimated that the NETeller Group derived approximately 95% of its revenues from processing money transfers for the Internet gambling market, and NETeller stated that the NETeller Group intended to focus its growth on money transfer services for the Internet gambling market.

10. In 2004, the NETeller Group processed approximately $3.4 billion in transactions for customers throughout the world and generated gross revenues of approximately $64 million from transactions initiated in the United States. In 2005, the NETeller Group processed approximately $7.3 billion in transactions for customers throughout the world and generated gross revenues of approximately $123 million from transactions initiated in the United States. In 2006, the NETeller Group processed more than $10 billion in transactions for customers throughout the world and generated gross revenues of approximately $169 million from transactions initiated in the United States.

11. By December 2006, the NETeller Group provided money transfer services to approximately 490,000 active United States customers, and the majority of the NETeller Group's money transfers were between customers located in the United States, including in the Southern District of New York, and Internet

gambling operators located outside of the United States. Also by December 2006, the NETeller Group had opened accounts for approximately 3,000 merchants, of which almost half were Internet gambling operators.

## Licensing and Regulation

12. In October 2004, NETeller (UK) Ltd., a subsidiary of NETeller plc, was authorized by the Financial Services Authority to operate as a regulated "e-money" issuer. At no time did NETeller plc or its subsidiaries obtain a license from any state government or register with the federal government to operate a money transmittal business in the United States.

## NETeller's Money Processing Mechanisms

13. Until January 2007, NETeller customers located in the United States were able to transfer funds to and from their NETeller accounts in various ways. These funds comprised, among other things, funds that were used to place bets or wagers with Internet gambling businesses and payments to customers that represented the proceeds of betting and wagering with Internet gambling businesses. As set forth below, NETeller took various steps to prevent NETeller from being physically present in the United States and to prevent the NETeller name from being associated with financial transactions between NETeller and its customers in the United States.

14. NETeller's customers located in the United States were able to transfer funds to their NETeller accounts in any of the following ways: electronic check; wire transfer; credit card; and cash deposit. NETeller customers located in the United States were able to withdraw funds from their NETeller accounts by electronic check, bank check, wire transfer, or with a NETeller ATM card. These funds comprised, among other things, winnings from bets or wagers placed through websites operated by Internet gambling businesses. Until December 2005, United States customers could withdraw money from their NETeller accounts through an electronic check or a bank check drawn against an account held at a commercial bank in the United States in the name of JSL US.

### The Legality of NETeller's Business

15. In connection with the activities set forth above, NETeller and its predecessors, through certain employees and directors, understood that the services it provided to customers located in the United States in the form of unlicensed money transmitting services and transferring funds to and from Internet gambling operators located outside of the United States violated various laws in the United States. Indeed, in its IPO prospectus, NETeller stated in substance the following: that criminal laws exist in the United States that prohibit persons from promoting certain forms of gambling; that criminal laws exist in the United States that prohibit the transmission of funds that are known to

have been derived from criminal activity or are intended to promote criminal activity; and that there can be no assurance tnat the government of the United States will not try to prosecute the NETeller under existing or future federal laws. More specifically, NETeller and its predecessors, through certain employees and directors, agreed to participate in violations of the Wire Act (18 U.S.C. § 1084), the prohibition of illegal gambling businesses statute (18 U.S.C. § 1955), the laundering of monetary instruments statute (18 U.S.C. § 1956), and the prohibition of unlicensed money transmitting businesses statute (18 U.S.C. § 1960), all in violation of 18 U.S.C. § 371.

16. Notwithstanding paragraph 14 above, after the passage of the Unlawful Internet Gambling Enforcement Act (the "Act") in October 2006, NETeller determined that it would have to withdraw from the United States market within 270 days of passage of the Act. NETeller took steps to prepare for an orderly withdrawal from the United States market, including changing its information technology platform to turn off functionality for all United States customer accounts and routing additional funds to repay its United States customers to accounts held by its United States-based ACH Processors. NETeller continued to serve the United States market until mid-January 2007, when the United States Government arrested Stephen Eric Lawrence and John David Lefebvre and seized approximately $55-$60 million of NETeller funds.

17. Shortly after the arrests of Stephen Eric Lawrence and John David Lefebvre, NETeller stopped offering its services to customers located in the United States and began cooperating with the investigation of the Office of the United States Attorney for the Southern District of New York.

### The Defendant-in-rem Funds

18. On or about July 17, 2007, NETeller entered into a Deferred Prosecution Agreement with the Government in connection with its role in the fraud (the "Agreement").

19. As part of the Agreement, NETeller agreed to forfeit $136 million to the United States.

20. NETeller plc agreed to make the following payments:

   a. **The Initial Funds.** The United States has already seized to date approximately $55-$60 million pursuant to various seizure warrants.

   b. **The Deferred Funds**. NETeller agrees that it will satisfy the remaining portion of NETeller's forfeiture obligation with a payment of $40 million to be paid on or before October 15, 2007, and the remaining balance (approximately $31 - $36 million) to be paid on or before January 17, 2008.

21. On or about October 15, 2007, NETeller plc made a payment via wire transfer to the United States Marshals Services in the amount of $39,999,970.00.

21. On or about October 15, 2007, NETeller plc made a payment via wire transfer to the United States Marshals Services in the amount of $39,999,970.00.

### III. CLAIM FOR FORFEITURE

22. Incorporated herein are the allegations contained in paragraphs one through twenty of this Verified Complaint.

23. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture:

> "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

24. By reason of the above, the defendant-in-rem funds are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C), because there is probable cause to believe that the defendant-in-rem funds constitute property derived from a wire fraud, illegal gambling businesses, and unlicensed money transmitting business, in violations of Title 18, United States Code, Sections 1084, 1955, 1956 (a)(2), and 1960.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the defendant-in-rem funds and that all persons having an interest in the defendant-in-rem funds be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of

the defendant-in-rem funds to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       November 19, 2007

                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the Plaintiff
                        United States of America

By: _____
     SHARON COHEN LEVIN (SCL-4124)
     Assistant United States Attorney
     One St. Andrew's Plaza
     New York, New York 10007
     Telephone: (212) 637-1060

VERIFICATION

STATE OF NEW YORK            )
COUNTY OF NEW YORK           :
SOUTHERN DISTRICT OF NEW YORK )

    Roy Pollitt, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

    The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Title 18, United States Code.

_____
Roy Pollitt
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of November, 2007

_____
NOTARY PUBLIC

LESLEY B. GLENN
Notary Public, State of New York
No. GL-4054637
Qualified in New York County
Commission Expires 6/30/11